**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES NELSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 12 CV 01595 |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff James Nelson has moved to reverse the decision of the Administrative Law Judge denying his Social Security benefits or, alternatively, remand for further proceedings [11]. In response, the Commissioner seeks a judgment upholding the denial of benefits [13]. For the following reasons, the Court denies Plaintiff's motion, grants the Commissioner's motion, and affirms the decision of the Administrative Law Judge.

**I.    Procedural Background**

On July 30, 2008, Plaintiff applied for disability benefits, alleging that he became disabled as of September 29, 2004. Administrative Record at 214.[1] Plaintiff's application was denied initially and upon reconsideration. R. at 111, 125. Plaintiff requested a hearing, which was held on June 3, 2010, before Administrative Law Judge ("ALJ") Karen Sayon. R. at 47. The ALJ denied Plaintiff's claim. R. at 29-39. Plaintiff sought review of the ALJ's decision and the Appeals Council denied this request, leaving the ALJ's decision the final decision of the Commissioner. R. at 1-4. Plaintiff now seeks judicial review of a final decision of the

---

[1] Unless otherwise indicated, all references in Sections I and II refer to the administrative record in this matter.

Commissioner of Social Security Michael J. Astrue.  This Court has jurisdiction pursuant to 28 U.S.C. § 405(g).

II.     Facts

    A.     Background

Plaintiff was born in 1959 and was 50 years old at the time of his hearing.  R. at 102. Plaintiff has a high school education and worked as a delivery driver from September 1990 through March 1993.  R. at 254.  Plaintiff also worked as a carpenter from March 1993 through July 2005.  R. at 253.  Most recently, Plaintiff worked as a laborer for a tent rental company from July 2007 through the end of August 2007, and only a few days of each month for after that until March 2008.[2]  R. at 253.  Plaintiff indicated that he was unable to work due to attention deficit hyperactivity disorder ("ADHD"), mood disorder, rheumatoid arthritis, and asthma.  R. at 538.

    B.     Medical Evidence

Plaintiff has had a history of asthma problems.  These problems have been around since childhood, but were manageable until November 2004 when Plaintiff was exposed to mold while working.  R. at 455.  Plaintiff developed shortness of breath and a cough and was admitted to Morris Hospital on September 27, 2004 and kept there for three days.  R. at 451.  At the time, Plaintiff had a two pack per day smoking habit for at least the past twenty to twenty-five years. R. at 455, 479.  Plaintiff was diagnosed with acute exacerbation of chronic obstructive pulmonary disease and bronchitis.  R. at 451.

On November 12, 2004, Plaintiff again went to the emergency room at Morris Hospital after developing a cough and shortness of breath after being exposed to cement dust while

---

[2] Plaintiff reported that he worked one to two days each month from October 2007 through January 2008 and worked only one day in March 2008.  R. at 221.

helping a friend.  R. at 476.  Plaintiff was held for five days and was again diagnosed with acute exacerbation of chronic obstructive pulmonary disease and bronchitis.  R. at 499.

On August 19, 2006, Dr. Ezike, a state agency physician, conducted a consultative exam of plaintiff for the Social Security Administration ("SSA").  R. at 524-28.  Plaintiff stated that he quit smoking in 2004 but that he drinks about six beers a day.  R. at 525.  Dr. Ezike concluded that Plaintiff suffered from asthma and a history of rheumatoid arthritis.  R. at 527.

On August 30, 2006, Dr. B. Rock Oh completed a physical residual functional capacity ("RFC") assessment of Plaintiff.  R. at 442-49.  Dr. Rock Oh determined that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours in an eight hour work day, sit about six hours in an eight hour work day, and was not limited in his ability to push or pull.  R. at 443.  Dr. Rock Oh also determined that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, humidity, as well as dusts and poor ventilation.  R. at 446.  In the report, Dr. Rock Oh noted "Clmt has mild asthma.  Clmt has no hospitalization for asthma since 2004." (sic)  R. at 449.

On March 19, 2008, Plaintiff completed a mood anxiety rating scale self assessment.  R. at 430.  On a scale of 0-100, 0/100 being "none," 25/100 being "mild," 50/100 being "moderate," 75/100 being "very bad," and 100/100 being "the worst ever," Plaintiff rated his anxiety at 50/100, worry at 25/100, irritability at 25/100, and being easily fatigued at 100/100.  *Id*.  Plaintiff also indicated that he had had thoughts of harming others.  *Id*.

On April 2, 2008, Plaintiff completed a second mood anxiety rating scale self assessment.  R. at 429.  Plaintiff reassessed his anxiety at 50/100, worry at 50/100, irritability at 50/100, and being easily fatigued at 50/100.  *Id*.  Plaintiff this time indicated that he had not had thoughts of harming others.  *Id*.

On April 16, 2008, Plaintiff completed a third mood anxiety rating scale self assessment. R. at 428. Plaintiff assessed his anxiety at 75/100, worry at 50/100, irritability at 25/100, and being easily fatigued at 50/100. *Id*. Plaintiff again indicated that he had not had thoughts of harming others. *Id*.

On June 16, 2008, Plaintiff began receiving metal health treatment from Dr. John Goldin-Mertdogan at the Institute for Personal Development. R. at 346. Dr. Goldin-Mertdogan is a psychiatrist who earned his M.D. at the University of Illinois College of Medicine and completed his residency in psychiatry at Loyola University Hospital and Medical Center. R. at 538. Dr. Goldin-Mertdogan specializes in the diagnosis and treatment of depression, anxiety, attention deficit disorder, and bipolar disorder. *Id*. During their initial meeting, Dr. Goldin-Mertdogan noted that the plaintiff gets bored easily with everything, gets into confrontations with other people, and that he is impatient and forgetful. R. at 346. Dr. Goldin-Mertdogan diagnosed Plaintiff with ADHD. *Id*.

Plaintiff continued to meet with Dr. Goldin-Mertdogan about once a month, but sometimes only once every two or three months. R. at 345-46, 410, 427, 437-40. Dr. Goldin-Mertdogan's notes indicate that Plaintiff was anxious, paranoid, anti-social, and lethargic at their early meetings in 2008. R. at 346. After a few months, the progress notes indicate that Plaintiff's condition was improving and that he was becoming less paranoid and more social. R. at 345, 410. Dr. Goldin-Mertdogan also indicated that Plaintiff told him about having "weird dreams" about being back in school as well as being unable to perform a former job. R. at 410. Dr. Goldin-Mertdogan adjusted Plaintiff's medication at that meeting. *Id*. In late 2008 and early 2009, Dr. Goldin-Mertdogan noted that Plaintiff was doing fairly well and that his mood was calm and stable, but that Plaintiff was still paranoid and unable to work. R. at 427. In July 2009,

Dr. Goldin-Mertdogan noted that Plaintiff had been "very angry, irritable, edgy, throwing knives into his wall at home" and that he "continues to experience disturbing dreams." R. 426. Dr. Goldin-Mertdogan also noted that prior to this meeting Plaintiff had run out of his medication. *Id*. At the beginning of 2010, Plaintiff ran out of his medication again and "started sleeping more and [became] more nervous." R. at 438. The remaining reports of 2010 from Dr. Goldin-Mertdogan indicate that Plaintiff continued to have low energy and low motivation and that he "doesn't like feeling trapped inside." *Id*.

On August 7, 2008, Plaintiff completed a function report. R. at 291-95. In the report, Plaintiff stated that before his illness, he was able to "work with people or just go places" and "use[d] to do all kinds of interactive things, sports, dancing, parties ext." (sic) R. at 290, 293. After his illness, he stated that he reads and watches TV all day in his apartment. R. at 293. While Plaintiff remarked that his illness does not affect his ability to bathe, shave, feed himself, or use the bathroom, he also stated that he often needs to be reminded to do these things. R. at 290-91. Plaintiff also noted that his illness affects his ability to complete tasks, concentrate, follow instructions, and get along with others because he "just don't care." R. at 293. Plaintiff reported that he can follow written instructions well but not spoken instructions. R. at 294.

On August 29, 2008, Scott Darlington, Plaintiff's cousin, completed a third-party function report. R. at 273-85. Mr. Darlington had known Plaintiff for forty-three years and was seeing him almost every day at the time the report was completed. R. at 273. In the report, Mr. Darlington wrote that Plaintiff "spends a lot of time alone in his apartment" and that his illness affects his sleep and is up at "all times of the day and night." R. at 273-74. Mr. Darlington also reported that Plaintiff does not need any special reminders to take care of personal needs and grooming and, while he is "very good at cleaning his stuff," he needs help or encouragement to

5

do his chores because "he seems to wander away." R. at 275. Regarding money, Mr. Darlington noted that Plaintiff cannot pay his bills and that his mom pays them for him. R. at 281. Regarding social interactions, Mr. Darlington noted that Plaintiff "has social difficulties. He fights, argues and is a major know-it-all. He is avoided quite a lot!" R. at 284. Mr. Darlington noted that this carries over into Plaintiff's ability to work stating Plaintiff "is not capable of working for people or with them. He is very quick to tell them how to do things . . . [and] angers those around him." R. at 284. Mr. Darlington also wrote that Plaintiff "has an obsession with believing people are trying to wrong him" and is "not able to stay on task" as a result. *Id.*

On September 5, 2008, Dr. R. Leon Jackson, a state psychiatric consultant, completed a form called a "psychiatric review technique." R. at 371. He found that the plaintiff's "statements indicate [that] he has isolated [him]self, doesn't like to be around people and doesn't have interest in anything except reading and watching TV." R. at 383. Dr. Jackson found these statements to be consistent with the diagnosis of mood disorder. *Id.* Dr. Jackson noted that "the claimant appears to be credible." *Id.* Dr. Jackson also found Plaintiff's stated difficulty with paying attention and concentration to be consistent with Dr. Goldin-Mertdogan's notes. *Id.* Nonetheless, Dr. Jackson found that there was insufficient evidence to make a medical disposition. R. at 371.

On September 8, 2008, Dr. Tyrone Hollerauer (PsyD), a state consultant, completed a psychiatric review technique form. R. at 385. Dr. Hollerauer rated the degree of Plaintiff's functional limitations in the categories of "Restrictions of Activities of Daily Living; Difficulties in Maintaining Social Functioning; Difficulties in Maintaining Concentration, Persistence, or Pace; and Episodes of Decompensation, Each of Extended Duration." R. at 395. Dr. Hollerauer found that Plaintiff had a "Moderate" degree of limitation in the first three categories and had

undergone "One or Two" episodes of decompensation. *Id*. Dr. Hollerauer indicated that Plaintiff "is limited to simple routine tasks." R. at 397.

On the same day, Dr. Hollerauer also completed a Mental RFC Assessment of Plaintiff. R. at 399. Dr. Hollerauer rated Plaintiff's capacity to sustain a mental activity in the four mental activities of functioning relevant to a disability determination, on a scale of one to five, one being "not significantly limited," two being "moderately limited," three being "markedly limited," four "no evidence of limitation," and five "not ratable on available evidence." *Id*. In the mental category of "Understanding and Memory," which consisted of three performance categories, Dr. Hollerauer found that Plaintiff was moderately limited in one category and not significantly limited in two categories. *Id*. In the mental category of "Sustained Concentration and Persistence," which consisted of eight performance categories, Dr. Hollerauer found that Plaintiff was moderately limited in four categories and not significantly limited in four categories. R. at 399-400. In the mental category of "Social Interaction," which consisted of five performance categories, Dr. Hollerauer found that Plaintiff was moderately limited in one category and not significantly limited in four categories. R. at 400. In the mental category of "Adaptation," which consisted of four performance categories, Dr. Hollerauer found that Plaintiff was not significantly limited in all four categories. R. at 400. Dr. Hollerauer concluded that the Plaintiff "is of normal intelligence . . . and would have difficulty doing tasks that are complex or involve significant focus." R. at 401. He also concluded that the Plaintiff "could occasionally do 3-4 step tasks and could reliably do 1-2 step tasks . . . [and] is limited to simple type tasks." *Id*.

On September 10, 2008, Dr. Jerrold Heinrich (PhD), a state Disability Determination Services consultant, reconsidered the prior decisions of Drs. Jackson and Hollerauer. R. at 405. On reconsideration, Dr. Heinrich concluded there were insufficient medial records available to

make an assessment of work-related functioning. *Id*. Dr. Heinrich also noted that an assessment of credibility was impossible given the lack of medical evidence. *Id*. Therefore, Dr. Heinrich affirmed the initial psychiatric review technique form. *Id*.

On November 26, 2008, Dr. Heinrich was asked again to reconsider the prior decisions of Drs. Jackson and Hollerauer in light of additional medical records from Dr. Goldin-Mertogan. R. at 409-13. After reviewing the new medical records, Dr. Heinrich noted that Plaintiff "was found capable of simple routine tasks with limited social contact. He was returned to other work." R. at 413. Dr. Heinrich again affirmed the initial psychiatric review technique form. R. at 412.

On May 5, 2009, Dr. David Biscardi (PhD), an independent medical expert, completed a medical mental impairment interrogatory. R. at 418-23. Dr. Biscardi did not examine Plaintiff nor was he familiar with the substance of the case prior to he review. R. at 419. Dr. Biscardi, after reviewing the medical evidence, found there was insufficient evidence for Plaintiff's Title II claim, affirming the Disability Determination Services assessment. R. at 418. Regarding Plaintiff's Title 16 claim, Dr. Biscardi found there was insufficient medical evidence of record to assess the severity of Plaintiff's impairment and recommended a mental status exam. *Id*.

On April 29, 2010, Dr. Goldin-Mertdogan completed a mental RFC questionnaire of Plaintiff. R. at 432-36. Dr. Goldin-Mertdogan noted that Plaintiff had ADHD, mood disorder, rheumatoid arthritis, and asthma. R. at 432. He also noted that Plaintiff was unable to work due to his illness and gave him a "poor" prognosis. *Id*. Dr. Goldin-Mertdogan assessed Plaintiff with a GAF of 50 noting he had "no friends" and rated his highest GAF in the past year also at 50 noting Plaintiff is "unable to keep a job." *Id*. The mental RFC questionnaire next asked Dr. Goldin-Mertdogan to identify Plaintiff's signs and symptoms. Of the 55 possible signs and

symptoms, Dr. Goldin-Mertdogan found that Plaintiff possessed 33 of them.  R. at 433.  Next, Dr. Goldin-Mertdogan was asked to rate Plaintiff's mental abilities and aptitudes to do unskilled work, to do semiskilled and skilled work, and to do particular types of jobs.  R. at 435-35.  In each of these categories, Dr. Goldin-Mertdogan marked "no useful ability to function" for every sub-category.  *Id*.  He also assessed Plaintiff's ability to work at a job on a sustained basis.  Dr. Goldin-Mertdogan anticipated that Plaintiff's impairments would cause him to be absent from work about one day per month.  R. at 436.  In addition, Dr. Goldin-Mertdogan noted that Plaintiff is "easily overwhelmed by daily stresses, paranoid of people, can't stay in one place for long, impatient, agitated and easily irritable and angered, breaks things when angry."  *Id*.

### C. The Hearing on June 3, 2010

Plaintiff testified at his hearing.  Plaintiff testified that he takes Vyvanse, Abilify, Lexapro as well as another drug for his mental condition.  R. at 59-60.  He noted that his medication causes apathy and makes him not "care about nothing."  R. at 59.  Plaintiff testified that the medication was helping with his concentration and his temper, but that he still has issues with his anger.  R. at 60-61.  In addition to his medication, Plaintiff testified that he had been seeing Dr. Goldin-Mertdogan once a month for two years for twenty-minute sessions.  R. at 62.  In addition to his visits, Plaintiff also explained that his cousin checks in on him about four times a week and that his parents pay his bills for him.  R. at 69.  Regarding his physical pain, Plaintiff testified about trouble with arthritis and asthmas, but admitted that medication makes both manageable.  R. at 64-65.  He also testified that he often felt anxious, had a hard time following and understanding instructions, became bored easily, and had difficulty interacting with others. R. at 71-76.  Plaintiff estimated that he could sit continuously for an hour without needing to get up.  R. at 66.  If he sat for more than an hour, he would become anxious and need to move

around or leave the room. R. at 73. The ALJ found that the Plaintiff could do simple and routine work, subject to limitations on interactions with other and a need to avoid concentrated exposure to respiratory irritants, extreme heat, extreme cold, or humidity. R. at 34.

Plaintiff's father, John Nelson, also testified at the hearing on behalf of Plaintiff. R. at 83-94. John Nelson testified that Plaintiff had difficulty holding attention and getting along with others. R. at 84. He also testified that he pays for Plaintiff's cell phone. R. at 92. John Nelson also testified that Plaintiff becomes frustrated when others tell him what to do and often does not finish tasks that he begins. R. at 86-87.

During the hearing, Edward Pagella, a vocational expert, described Plaintiff's past relevant work as a carpenter as a skilled occupation with a heavy level of physical demand. R. at 95. Mr. Pagella also described Plaintiff's past work as a delivery driver as a lower level semi-skilled occupation with a medium level of physical demand. *Id.* Mr. Pagella noted that Plaintiff's job as a laborer did not reach the level of substantial gainful activity. R. at 95-96. At the administrative hearing, the ALJ asked Mr. Pagella to assume an individual of Plaintiff's age, education, and past work experience; who was limited to medium work, but could lift and carry up to 25 pounds frequently, 50 pounds occasionally; stand and walk about six out of eight hours in a work day; receive only simple instructions, only routine tasks, and no public interaction; and must avoid concentrated exposure to respiratory irritants, extreme heat, extreme cold, or humidity. R. at 96. The ALJ then asked whether any of Plaintiff's past work would be available to that hypothetical person. *Id.* Mr. Pagella testified that the hypothetical individual could not perform Plaintiff's past relevant work. R. at 96-97. Mr. Pagella did testify that the hypothetical individual could work as a hand packer, Dictionary of Occupational Titles ("DOT") # 920.587-018, in which there are 38,300 jobs in the region; a hand assembler, DOT # 806.684-010, in

which there are 20,700 jobs in the region, or as a laundry worker, DOT # 361.687-018, in which there are 16,000 jobs in the region.  R. at 96-97.  According to Mr. Pagella, these jobs would not require more than occasional interaction with co-workers or supervisors.  R. at 97.  These jobs do require a person be on task more than seventy percent of the time and not get into verbal arguments with co-workers and supervisors.  R. at 97-98.  These jobs also require a person to understand and carry out simple instructions.  R. at 98-99.  Mr. Pagella also explained that if a person needed to take a break every hour then there would be no work available for that person. R. at 99-100.

## III.    Standard of Review

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  See *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.  See *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within

the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and were made under the correct legal standard. See *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. See *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); see also *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## IV.    Disability Standard

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has

lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if so, the inquiry proceeds to Step 3; (3) Does(Do) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); see also *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant

evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id.* at 1000; see also *Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## V.    Analysis

The Plaintiff argues that the ALJ erred by rejecting the treating psychiatrist's opinion and placing no weight on it. The Commissioner contends that the ALJ set forth sufficient reasons for rejecting the treating psychiatrist's opinion and that the ALJ's decision is supported by substantial evidence. Plaintiff also maintains that the ALJ erred by failing to make a credibility determination concerning the testimony of the Plaintiff's father, Joseph Nelson. The Commissioner, on the other hand, contends that the ALJ did not commit reversible error by not considering Joseph Nelson's testimony and argues alternatively that any error was harmless. The Court agrees with the Commissioner — the ALJ's decision is supported by substantial evidence and the ALJ did not commit legal error.

### A.    Whether the ALJ Reasonably Rejected the Treating Psychiatrist's Opinion

The opinion of a "treating source" is entitled to "controlling weight" if it is adequately supported by objective medical evidence and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Larson v. Astrue*, 615 F.3d 744, 749, (7th Cir. 2010); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer "good reasons" for doing so. *Larson*, 615 F.3d at 751; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). Additionally, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5P, 1996 SSR LEXIS 2, *6-7. Nevertheless, opinions from any medical source on issues reserved to the

14

Commissioner must never be ignored. *Id.* The ALJ must determine what weight to give to the opinion using the factors listed in § 404.1527(c), including the length of treatment, the physician's specialty, and the types of diagnostic tests performed. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). As to Plaintiff's first argument, the Court disagrees that the ALJ erroneously credited the state agency medical consultants Dr. Jackson and Dr. Hollerauer over the views of Dr. Goldin-Mertdogan, the treating psychiatrist, in evaluating Plaintiff's mental impairments.

If a nontreating physician contradicts the treating physician's opinion, it is the ALJ's responsibility to resolve the conflict. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (ALJ must decide which doctor to believe). An ALJ may reject a treating physician's opinion if the opinion is unsupported or inconsistent with the evidence in the record. But, if the ALJ rejects the opinion, she must give a good reason. 20 C.F.R. § 404.1527(c)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision."); *Schaaf*, 602 F.3d at 875; *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."); *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence.").

In concluding that Plaintiff has the mental RFC to perform and sustain simple, repetitive, unskilled work, the ALJ determined that he can understand, remember, and carry out simple, routine instructions; should have no public interaction; and should have only limited interaction

with his supervisors or co-workers.  R. at 34.  Plaintiff challenges the sufficiency of this finding by arguing that the ALJ improperly rejected the opinion of his treating psychiatrist Dr. Goldin-Mertdogan.  In her decision, the ALJ "did not credit the opinion from Dr. Goldin-Mertdogan." R. at 37.  Instead, the ALJ gave substantial weight to the opinions of the state agency medical consultants Dr. Jackson and Dr. Hollerauer.  The ALJ's reason for doing so was that the medical expert's opinions were "consistent with the objective evidence of the record."  R. at 36.

The ALJ gave a number of reasons for rejecting Dr. Goldin-Mertdogan's mental RFC opinion.  First, the ALJ noted that Dr. Goldin-Mertdogan checked 25 of 25 boxes in his mental RFC assessment that the Plaintiff had "no useful ability to function" regarding his ability to perform unskilled work.  While check box forms themselves are not inherently weak evidence (the SSA uses them and the ALJ relied upon those of Dr. Jackson and Dr. Hollerauer) they must be supported by the medical record.  *Larson*, 615 F.3d at 751; *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's rejection of physician's check-box form where it was contradicted by evidence in the record).  Here, the ALJ found that despite Dr. Goldin-Mertdogan's finding, Plaintiff had never been hospitalized for his mental impairments and is able to live alone and take care of his day-to-day needs.  R. at 37.  The ALJ also noted that nothing in the record shows that Plaintiff has ever been fired due to his inability to get along with others. *Id.*  Furthermore, the progress notes, as the ALJ explained, show that Plaintiff's condition was stable and had been improving while Plaintiff was taking his medication.  R. at 345, 427, 438, 439.  The ALJ correctly noted that Dr. Goldin-Mertdogan's opinion was at odds with his treatment notes, Plaintiff's mental health record, as well as Plaintiff's own self assessment ratings.  These inconsistencies were appropriate considerations in determining what weight to assign Dr. Goldin-Mertdogan's opinion.  *See* 20 C.F.R. § 404.1527(c)(4).  Also, the ALJ pointed

out that Plaintiff testified that he is able to socialize daily at the bar below his apartment (R. 78) and that there is no clear indication in the record that Plaintiff has ever lost a job due to his condition.[3]

Plaintiff also contends that the ALJ did not properly apply 20 C.F.R. § 404.1527 because the ALJ failed to give more weight to Dr. Goldin-Mertdogan's opinion simply because he was a treating source. While generally an ALJ should give more weight to the opinion of a treating source, an ALJ is not bound to do so if she finds that the treating source's opinion is contradicted by the record — as the ALJ did in this instance. *Knight*, 55 F.3d at 314 ("Medical evidence may be discounted if it is . . . inconsistent with other evidence."); *see Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)) ("We must keep in mind the biases that a treating physician may bring to the disability evaluation. 'The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.' "); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003) ("such skepticism may have a stronger basis when the treating physician squares off against a neutral consultant appointed by the Social Security Administration").

Additionally, Plaintiff asserts that the ALJ failed to consider the length of contact that Dr. Goldin-Mertdogan had with Plaintiff (under 20 C.F.R. § 404.1527(c)(2)). Dr. Goldin-Mertdogan was treating Plaintiff for almost two years at the time that he completed his mental RFC opinion. R. at 432-36. In rejecting his opinion, the ALJ remarked that Dr. Goldin-Mertdogan had only seen Plaintiff "once every month or two since 2008 for medication checks." R. at 37. In

---

[3] Plaintiff admits that he left his job as a carpenter because he was not "into it" anymore, (R. at 58) was let go from his job as a propane delivery driver because he pulled away while the refueling hose was still attached. R. at 57. He also admits that his work as a laborer was seasonal and that the employer called him back month after month to help. R. at 221.

addition, Plaintiff testified that his sessions with Dr. Goldin-Mertdogan were only twenty minutes long. R. at 62. The ALJ adequately considered Dr. Goldin-Mertgogan's treatment relationship with Plaintiff when she explained the weight given to his opinion.

Plaintiff also asserts that the ALJ failed to weigh Dr. Goldin-Mertdogan's mental RFC opinion using all of the factors outlined in 20 C.F.R. § 404.1527(c) and specifically that the ALJ did not take into account Dr. Goldin-Mertdogan's specialization. While the ALJ did not specifically discuss Dr. Goldin-Mertdogan's specialization in the diagnosis and treatment of depression, anxiety, attention deficit disorder, and bipolar disorder, the ALJ did consider that Dr. Goldin-Mertdogan was a psychiatrist and relied upon his diagnosis of ADHD and mood disorder for her opinion. R. at 32, 35. And, as explained above, the ALJ gave numerous reasons for rejecting Dr. Goldin-Mertdogan's mental RFC opinion: the ALJ considered that Dr. Goldin-Mertdogan was a treating physician, but that their relationship was limited to only once every month or two; that there was no substantiated record that the Plaintiff had ever lost a job due to his condition; that he is able to socialize; and that Dr. Goldin-Mertdogan's opinion was not only inconsistent with his treatment notes, but also inconsistent with Plaintiff's own self-assessment ratings. R. at 37. Thus, to the extent that the ALJ's failure to specifically note Dr. Goldin-Mertdogan's specialization in assessing his opinion constitutes a deficiency, the Court believes it to be harmless. *See Skarbek*, 390 F.3d at 504 (error was harmless when "although the ALJ did not explicitly consider [plaintiff's] obesity, it was factored indirectly into the ALJ's decision as part of the doctor's opinions"); *Keys v. Barnhart*, 347 F.3d 990, 995–95 (7th Cir. 2003) ("doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); *Cohen v. Barnhart*, 472 F. Supp. 2d 966, 972-73 (N.D. Ill. 2006) (any failure by ALJ to provide sufficient reasons for rejecting physician's testimony that social security

disability claimant was disabled by multiple sclerosis was harmless, where ALJ's treatment of another physician's opinion sufficiently afforded description of inconsistencies relied upon by ALJ in denying benefits); *Pigram v. Barnhart*, No. 00 C 7163, 2002 WL 187500, at *8 (N.D. Ill. Feb. 6, 2002) (ALJ's failure to discuss weight given to a doctor's opinion was harmless in light of the opinion's inconsistencies with the record). Ultimately, a remand on this point would not result in a different outcome, for the ALJ would simply reproduce her analysis concerning Dr. Goldin-Mertdogan's progress notes in addressing his mental RFC opinion. *See Keys*, 347 F.3d at 994–95; *Pigram*, 2002 WL 187500 at *8 (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)) ("[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). In sum, the Court concludes that the ALJ reasonably rejected Dr. Goldin-Mertdogan's mental RFC opinion.

### B. Whether the ALJ Was Required to Make A Credibility Finding of John Nelson

Plaintiff next contends that the Court must reverse because the ALJ declined in its written opinion to specifically address the testimony of Plaintiff's father, Joseph Nelson. An ALJ has a duty to fully develop the record before drawing any conclusions and must adequately articulate his analysis so that we can follow his reasoning. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); 20 C.F.R. § 416.912(d). It is well established, however, that ALJs are not required to discuss every piece of testimony and evidence submitted. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Nonetheless, an ALJ may not ignore an entire line of evidence contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted). The ALJ must provide a "logical bridge" between the evidence and the conclusions so that the Court

can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Jones*, 623 F.3d at 1160.

In *Books v. Chater*, the plaintiff, Books, raised essentially the same challenge that Plaintiff brings here. 91 F.3d 972, 980 (7th Cir. 1996). In particular, Books objected to the ALJ's failure to specifically address the testimony of his brother, which had "served strictly to reiterate, and thereby corroborate, Books' own testimony concerning his activities and limitations." *Id*. The Seventh Circuit rejected Books' argument, explaining that in light of Books' own testimony, his brother's description of his limitations and activities was redundant. *Id.* The Seventh Circuit found that the ALJ did not err in declining to address Books' brother's testimony because any analysis would have been duplicative and therefore not a separate line of evidence. *Id.*; *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (finding ALJ did not err when failing to discuss claimant's wife's testimony because it was redundant and did not constitute a separate line of evidence).

The same is true here. Plaintiff's father's testimony did not constitute a separate "line of evidence." *Brooks*, 31 F.3d at 980. Instead, it served strictly to reiterate, and thereby corroborate, Plaintiff's own testimony concerning his activities and limitations. The ALJ, therefore, did not err by declining to address Joseph Nelson's testimony specifically.

## VI.        Conclusion

For the foregoing reasons, the Court finds that the decision of the ALJ is supported by substantial evidence and does not contain any errors of law.   Therefore, the Court denies Plaintiff's motion for summary judgment [11], grants the Commissioner's motion for summary judgment [13], and affirms the ALJ's decision in all respects.

Dated:  May 31, 2013

_____
Robert M. Dow, Jr.
United States District Judge